CHERYL NYKIEL, individually and )
and as ADMINISTRATRIX of the )
ESTATE OF GREGORY T. NYKIEL, )
Deceased, )
)
        Plaintiff, )
)
v. ) Civil Action No. 08-0813
)
BOROUGH OF SHARPSBURG )
SHARPSBURG POLICE DEPARTMENT, )
LEO RUDZKI, THOMAS DUFFY, )
BOROUGH OF ETNA, )
ETNA POLICE DEPARTMENT )
And CHAD MITCHELL, )
)
        Defendants. )

## MEMORANDUM

GARY L. LANCASTER,                          March 8, 2011
Chief Judge.

        This is an action in civil rights. Plaintiff, Cheryl

Nykiel, individually and as Administratrix of the estate of Gregory

T. Nykiel ("Nykiel"), alleges that defendants, Borough of

Sharpsburg, Borough of Etna, and police officers, Officer Thomas

Duffy, Officer Chad Mitchell, and Chief Leo Rudzki, violated Nykiel's constitutional rights.[1] Plaintiff has filed this suit under the Fourth and Fourteenth Amendments to the United States Constitution pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"). Plaintiff further submits claims under Pennsylvania law for battery, wrongful death, survival, and indemnification. Plaintiff seeks compensatory and punitive damages together with court costs, attorneys' fees, interest and all other relief permitted by the court.

Defendants have jointly moved for partial summary judgment under Fed. R. Civ. P. 56(c) on Counts I through VI of the complaint for excessive force, failure to obtain medical care for Nykiel, the municipalities' failure to train Officer Duffy, Officer Mitchell, and Chief Rudzki, and all state law claims against defendants. [Doc. No. 155]. Defendants contend that they did not deprive Nykiel of his federal constitutional rights or, in the alternative, that they have qualified immunity from liability on

---

[1] Plaintiff originally alleged that the Borough of Sharpsburg Police Department and Borough of Etna Police Department were defendants in this case. However, police departments are not legal entities separate from the Boroughs and are not subject to suit. Plaintiff concedes the same. [Doc. No. 167, p. 2]. Accordingly, these police departments are dismissed with prejudice from this action.

plaintiff's federal civil rights claims. For the purpose of this motion, parties agreed to except from those counts any judgment on allegations that defendants Officer Duffy, Officer Mitchell, and Chief Rudzki personally caused the death of Nykiel by asphyxiation through a choke-hold.

For the reasons that follow, the motion will be denied relating to the issues of excessive force and punitive damages against Officer Duffy, Officer Mitchell, and Chief Rudzki. Summary judgment will be granted for all other parties and claims in this action.

I.   Background

Unless otherwise indicated, for purposes of deciding the pending motion only, the following facts are undisputed.   We discuss   additional   facts   throughout   the   memorandum,   where applicable.

A.        Procedural Background

Plaintiff   filed   this   action   on   June   12,   2008. Stipulations   and   prior   orders   of   the   court   have   narrowed plaintiff's claims to the following: (1) a section 1983 claim against three defendant police officers, Officer Duffy, Officer

3

Mitchell, and Chief Rudzki [2], contending that they violated Nykiel's Fourth and Fourteenth Amendment rights; (2) a section 1983 claim against two remaining defendant boroughs, the Borough of Sharpsburg and the Borough of Etna, alleging that their failure to adequately train their police officers violated the Fourth[3] and Fourteenth[4] Amendment rights of Nykiel; and (3) Pennsylvania state law claims against all five remaining defendants (Rudzki, Duffy, Mitchell, Borough of Sharpsburg, and Borough of Etna) for battery (Count III), wrongful death (Count IV), survival (Count V) and indemnification (Count VI).

---

[2] To the extent that plaintiff brought claims against these officers in their official capacities, those claims are dismissed with prejudice. See Debellis v. Kulp, 166 F. Supp. 2d 255, 264-65 (E.D. Pa. 2001).

[3] Plaintiff has withdrawn all allegations of an unlawful traffic stop, unlawful pursuit, and unlawful arrest and proceeds on a Fourth Amendment theory of unreasonable, excessive force applied during an arrest of a person at liberty [Doc. No. 167, p. 2]. Plaintiff also claims that Nykiel's Fourth Amendment rights were violated because of the officers' failure to seek timely medical evaluation and care. The excessive force and failure to seek medical care claims are properly brought under the Fourteenth Amendment and the court has construed both claims as Fourteenth Amendment claims.

[4] Plaintiff proceeds under a state created danger theory of liability pursuant to the Fourteenth Amendment.

4

B.          Factual Background

        During the early morning hours of November 14, 2006,
Officer Duffy was on patrol and received a call about a burglary at
the Royal Biscuit Company in Sharpsburg, Pennsylvania.   Officers
Duffy, Mitchell, and others responded to the call and investigated
the scene. Afterwards, the officers pursued Nykiel across a number
of boroughs and jurisdictions.

        Once the officers were able to get Nykiel to stop his
vehicle, they surrounded him and ordered him to exit the vehicle.
Nykiel refused.   Instead, he sat in the vehicle with his hands on
the steering wheel.  Eventually, the officers extracted Nykiel from
his vehicle through the window, handcuffed, shackled, and arrested
him.   In extracting Nykiel, his wrists and hands were cut and
bleeding from the glass.    Their search of Nykiel revealed a
butterfly knife and approximately $8000 in cash.   The officers
retrieved a crack pipe, a police scanner, and contraband from
Nykiel's vehicle.

        According to their deposition testimony, none of the
officers noticed anything unusual about Nykiel's behavior during
the arrest, or that he was suffering from any serious medical
condition.   The only injury they noticed was that Nykiel was

bleeding from his wrists and hands.

After they arrested him, the officers placed Nykiel in the rear of Officer Duffy's patrol vehicle during which time one of the officers heard Nykiel mumble something, but when he inquired, Nykiel responded, ÇNevermind.Ç While Nykiel was seated in Officer Duffy's patrol car, Officer Fusco shined his flashlight at Nykiel and observed a discolored froth under Nykiel's nostrils. Officer Fusco thought this froth was odd, but never mentioned it or pointed it out to Officer Duffy. Officer Duffy did not notice the froth at that time.

Officers Fusco and Mitchell drove behind Officer Duffy back to the Sharpsburg Police Station. During that time, Nykiel asked Officer Duffy questions regarding the charges that would be brought against him and made other comments, like thanking Officer Duffy for not releasing the dogs on him. Nykiel's speech at this time was slurred and muffled.

While the Officers were en route, Officer Duffy requested an EMS unit to come to the Sharpsburg Police Station to evaluate Nykiel's physical injuries to make sure that he was okay. Based upon Officer Duffy's description of Nykiel's injuries, the radio dispatcher labeled the call E3, the lowest level EMS request for

6

non-life threatening injuries. Officer Duffy also called Leo Rudzki, the Chief of Police for the Sharpsburg Police Department, to inform him that he had Nykiel in custody and about the circumstances surrounding the chase and arrest.

When Officer Duffy arrived at the police station, Officers Fusco and Mitchell were already there. Nykiel exited the patrol vehicle and walked into the police station without any assistance. According to the Officers, Nykiel was behaving in a normal manner at this time. He was responsive and cooperative when the officers escorted him to the station's holding room. Nykiel complied with the Officers' instructions without any difficulty or assistance.

Once in the holding room, Officer Fusco questioned Nykiel. Nykiel was responsive and stated his name when Officer Fusco asked him to state it. Officer Fusco then asked Nykiel if he had taken any drugs, specifically asking him if he took crack that evening, and Nykiel nodded affirmatively and mumbled what sounded like yes. [Doc. No. 160, Exhibit F.] Officer Fusco then observed a white pasty substance around Nykiel's mouth and lower facial area, almost like toothpaste. This substance appeared different than the froth Officer Fusco observed under Nykiel's nostrils at the scene

7

of arrest. Officer Mitchell also observed a white, crusty substance on Nykiel's lips.

Officer Duffy had previously left the holding area to get Officer Fusco gloves. Even after Officer Duffy left the holding area, Officer Duffy was able to hear Officer Fusco ask Nykiel if he had something in his mouth. Soon thereafter, Nykiel spit a small white piece of paper out of his mouth. He then said that he was having trouble breathing, and he began to shake in what seemed, to Officer Fusco, to be a seizure or perhaps a reaction to ingesting cocaine. In order to give Nykiel freedom of movement, Officer Fusco removed Nykiel's handcuffs. He called Officer Duffy for assistance, and told the medics to call additional medics to see if they could get to the station more quickly to examine Nykiel.

Although Officer Fusco later informed Officer Duffy that Nykiel had spit up a small white piece of paper, Officer Fusco did not tell Officer Duffy at that time his suspicion that Nykiel may be having a seizure due to a cocaine overdose. However, Officer Fusco testified that, based upon his training and experience, he believed Nykiel may have been overdosing on a drug of some type.

When Officer Duffy reentered the holding room, Nykiel was lying with his back on the floor, swinging both of his arms

8

aggressively. At that time, Officer Duffy was not sure if Nykiel's actions were intentional, or if they were the result of a seizure. Shortly thereafter, the medics, EMTs Jamey Lavelle and David Sanford, entered the holding area. Nykiel was lying face up on the floor and moving around. Within seconds, Nykiel became unresponsive. The medics then began treatment on Nykiel. During this time, Chief Rudzki arrived at the station. He never entered the holding area, and therefore, never had any interaction with Nykiel. Upon arrival, he observed the events from the hallway for approximately three to five minutes and then went back to his office. Officer Fusco then told him he believed Nykiel was overdosing on cocaine.

At one point during the treatment, EMT Lavelle performed a sternal rub on Nykiel at which point EMT Sanford noticed white foam coming from Nykiel's mouth. As soon as EMT Lavelle rubbed Nykiel's sternum, Nykiel awoke. He was violent and combative. He was swinging his arms around and kicking his legs, growling and screaming. According to the medics, Nykiel was conscious, but was not responding to any commands; they believed that his combative behavior appeared deliberate and voluntary. Nykiel then began slamming the back of his head on the floor. Again, EMTs Lavelle

and Sanford believed that Nykiel was doing this deliberately.

Officer Duffy, Officer Fusco, and Officer Mitchell attempted to restrain Nykiel by grabbing his arms and legs and holding him down. Like the medics, they too believed that Nykiel's violent and combative behavior was intentional. At the request of Officer Duffy, EMT Sanford got sheets from the ambulance to place them under Nykiel's head. Either shortly before or shortly after the sheets were placed under Nykiel's head, Nykiel began to have a seizure. This seizure lasted approximately one minute, during which time EMT Lavelle radioed for a second ambulance to come to the police station.

Nykiel then appeared to go unconscious for approximately one more minute before regaining consciousness and becoming combative again. Nykiel lunged towards EMT Lavelle and bit him on his arm while he kicked EMT Sanford in the shins. The EMTs exited the holding area. The officers instructed them to remain outside the holding area until it was safe for them to return. The EMTs remained nearby so that they could see the holding area. The second ambulance arrived during this time, and EMTs Lavelle and Sanford informed the new medics as to what had occurred.

In the holding room, the Officers attempted to restrain

Nykiel but were unsuccessful. He continued swinging his arms and kicking his legs. At some point, Nykiel rolled over onto his stomach with his hands underneath his chest and continued to flail his legs. The officers repeatedly ordered Nykiel to remove his hands from underneath his chest; otherwise, he would be tasered. Nykiel did not comply. At this point, Officer Duffy believed that Nykiel's behavior was intentional and harmful. Officer Mitchell believed that Nykiel understood the commands but was intentionally failing to comply with them.

Because Nykiel failed to obey the officers' orders and continued to behave in an uncontrollable manner, Officer Duffy asked Officer Mitchell to use his Taser gun to apply a Çdrive stunÇ to Nykiel's back in order to subdue him. A drive stun tase is a tase of a lower level of voltage. Officer Mitchell did so for five seconds on the right side of Nykiel's back. In response, Nykiel laughed, then continued his aggressive behavior despite the drive stun, and continued to ignore the orders of Officers Duffy and Mitchell. Officer Duffy reached underneath Nykiel in order to pull his hands out, but Nykiel was tense and would not move his hands. Officer Duffy then asked Officer Mitchell to apply a second drive stun to Nykiel. Officer Mitchell did so, in the same area for the

same amount of time. Once again, the drive stun had no effect on Nykiel.

Officer Fusco advised against any further use of the drive stun, so Officer Duffy attempted to reach underneath Nykiel's body again and pull his hands out from under him. Officer Duffy was finally able to retrieve one of Nykiel's hands and handcuff it to the bench. Within a matter of seconds, Nykiel stopped resisting, and his body became limp. The medics entered into the holding cell and attempted to revive Nykiel. Shortly thereafter, Nykiel was rushed to the hospital and pronounced dead.

The autopsy report concluded that Nykiel "died as a result of acute cocaine overdose. Compression of the neck and fracture of the cervical spine [were] contributory factors to his demise." [Doc. No. 164, Exhibit BB]. Based on this finding, the parties' experts have reached different conclusions as to the cause of death.

Defendants' expert, Dr. Wayne K. Ross, opined that Nykiel's death was accidental as a result of his cocaine overdose. [See Doc. No. 149, Exhibit B]. Plaintiff's medical expert, Werner Spitz, M.D., opined that Nykiel died as a result of acute cocaine intoxication coupled with severe neck injuries which plaintiff

12

contends were caused by the officers' use of excessive force on Nykiel. [See Doc. No. 164, Exhibit CC]. Plaintiff's police practices expert, D.P. Van Blaricom, opined that Nykiel was more probably than not a victim of objectively unreasonable excessive force. [See Doc. No. 161, Exhibit K].

## II.  Legal Standard

Fed. R. Civ. P. 56(c) provides that summary judgment shall be granted if, drawing all inferences in favor of the non-moving party, the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986) (internal quotation marks omitted).

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Id. at 247-48. A dispute over those facts that might affect the outcome of the suit under the governing substantive law, i.e., the material facts, however, will preclude the entry of summary judgment. Id. at 248.

13

Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988).

It is on this standard that the court has reviewed defendants' motion, plaintiff's response, and defendants' reply thereto. Based on the pleadings and evidence of record, the arguments of counsel, and the briefs filed in support and opposition thereto, the court concludes, as a matter of law, that there remains a genuine dispute over material facts and precludes summary judgment in this matter relating to the issues of excessive force and punitive damages against Officer Duffy, Officer Mitchell, and Chief Rudzki. Summary judgment will be granted for all other parties and claims in this case.

III. Discussion

    A. Section 1983

        Section 1983 imposes civil liability upon any person

14

who, under color of state law, deprives someone of the rights, privileges, or immunities secured by the federal Constitution or the laws of the United States. Eichelman v. Lancaster County, 510 F.Supp.2d 377, 386 (E.D. Pa. 2007) (citing Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir.2000)); 42 U.S.C. § 1983.

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Id. (citing Graham v. Connor, 490 U.S. 386, 393-94 (1989)). This court's initial inquiry as to each count of the complaint, therefore, is whether Plaintiff has "alleged the deprivation of a right that either federal law or the Constitution protects." Gruenke, 225 F.3d at 298.

a. Fourteenth Amendment claims

Plaintiff contends that Nykiel was a "person at liberty" and she only must prove elements of her Section 1983 claims pursuant to the Fourth Amendment's proscriptions against unreasonable searches and seizures. Defendants contend that Nykiel was not a "person at liberty" and once under arrest was a pretrial detainee subject to the "deliberate indifference" standard of the Fourteenth Amendment.

Contrary to plaintiff's position, Nykiel was not a

15

"person at liberty" but a pretrial detainee. While Nykiel was not a convicted prisoner afforded Eighth Amendment protections, Nykiel was placed under arrest, in police custody, and he was no longer free to leave. Thus, his section 1983 claims must be examined under the Fourteenth Amendment.

The Due Process Clause of the Fourteenth Amendment protects pretrial detainees, those charged with, but not yet convicted of, a crime, see Bell v. Wolfish, 441 U.S. 520, 523 (1979), from the use of excessive force or restriction. James v. York County Police Dept., 160 Fed.Appx. 126, 131 (3d Cir. 2005); Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990). See e.g., Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). Under the Due Process Clause, a detainee must prove that law enforcement had an express intent to punish the detainee and must not have had an "alternative purpose" for the force or restriction or that the force or restriction "feels excessive in relation to the alternative purpose assigned to it." See Bell, 441 U.S. at 535-39 (citations omitted).

## i. Excessive Force

Plaintiff contends that Officer Duffy, Officer Mitchell, and Chief Rudzki violated Nykiel's constitutional rights by using

16

excessive force on Nykiel, following his arrest, to punish him for "the [high speed] pursuit and injury to other officers." [Doc. No. 167].

Defendants contend that, based upon the "deliberate indifference" standard of the Fourteenth Amendment, which is the same standard applied to convicted prisoners under the Eighth Amendment, defendants were not "deliberately indifferent" to Nykiel's safety while in custody.

Under the Fourteenth Amendment, liability for excessive force attaches when law enforcement is found to be "deliberately indifferent" to the pretrial detainee's health or safety. Langella, No. 09-0311, 2010 WL 3824222, *13 (citations omitted). Deliberate indifference occurs when law enforcement "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). However, the official must have actual knowledge of the excessive risk. An official must 1) be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and 2) also draw the inference. Id.; see Natale, 318 F.3d at 582 (citations omitted). No liability attaches under the Fourteenth Amendment simply if law enforcement should have known there was a serious risk of harm and did not act.

17

Bell, 441 U.S. at 838.

In light of the events that occurred after Nykiel was in custody, a reasonable jury could determine he was subjected to excessive force while he was a pretrial detainee for the following reasons.

First, after his arrest, he was in custody and experienced several intermittent seizures. During this time, Nykiel flailed and moved his arms uncontrollably. The officers tased Nykiel. When Nykiel was being tased, there were at least 4 officers present to restrain him. According to Officer Fusco's testimony, 4 officers were more than enough to restrain Nykiel at the time without the use of a taser.

Next, the evidence shows that the officers subdued and restrained Nykiel to assist the medics in treating him. In doing so, the officers testified they used the taser in drive stun mode twice. However, the record reveals that 5 to 7 more taser marks were found on Nykiel's body. The record also shows that Nykiel suffered physical injuries. Additionally, there is physical evidence of further trauma to his neck, trunk and extremities remains unexplained.

Moreover, in their deposition testimony, the officers

repeatedly admitted that at various times throughout their encounter with Nykiel they believed he was having an involuntary seizure. However, they proceeded to treat him as if they were unaware of his intermittent yet fragile physical state in their attempts to restrain him. These and other contrasting facts indicate that summary judgment should not be granted at this stage. A jury could find, based on this version of events, that the officers misrepresented the force used to restrain him and thus, subjected Nykiel to deliberate and excessive force in an effort to punish him in violation of his Fourteenth Amendment rights. Summary judgment for this claim will be denied.

## ii.  Failure to obtain medical care

Plaintiff contends that Officer Duffy, Officer Mitchell, and Chief Rudzki violated Nykiel's constitutional rights by failing to obtain medical care for Nykiel, following his arrest, to punish him for "the [high speed] pursuit and injury to other officers." [Doc. No. 167]. Defendants contend that, based upon the "deliberate indifference" standard of the Fourteenth Amendment, defendants were not "deliberately indifferent" to Nykiel's medical condition while in custody.

Under the Fourteenth Amendment, liability for inadequate

19

medical care attaches when law enforcement is found to be "deliberately indifferent" to the pretrial detainee's serious medical condition. Langella, No. 09-0311, 2010 WL 3824222, *13 (citations omitted). Deliberate indifference to a serious medical condition is found if there is an express intent to punish the pretrial detainee by denying medical care unless the denial of medical care is reasonably related to a legitimate governmental objective. Hubbard v. Taylor, 399 F.3d 150, 158 (3d Cir. 2005); Block v. Rutherford, 468 U.S. 576, 584 (1984).

A medical condition is "serious," if it is ". . . one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (citations omitted). Specifically, the Court of Appeals for the Third Circuit has found "deliberate indifference" in situations where there was "objective evidence that [a] plaintiff had serious need for medical care," and prison officials ignored that evidence. Nicini v. Morra, 212 F.3d 798, 815 n. 14 (3d Cir. 2000).

Here, the record lacks sufficient evidence to support a finding that the officers were "deliberately indifferent" to Nykiel's medical condition.

First, the record does not reflect that Officer Duffy, Officer Mitchell, or Chief Rudzki sought to punish Nykiel by failing to take him to the hospital when he was arrested. The "deliberate indifference" standard requires that officers actually know of a serious risk of harm to the detainee. There is not sufficient evidence from which a reasonable juror could find that any of the officers presently before the court were actually aware that Nykiel was suffering from a cocaine overdose at the time of arrest.

Likewise, although there is evidence that froth was coming from Nykiel's nose, only one officer, Officer Fusco, saw it. The froth did not exceedingly alarm him, as he did not inform the other officers. Thus, any dispute as to whether all of the officers saw the froth is immaterial because seeing the froth alone does not mean they would have made the inference that Nykiel was in a serious risk of harm, as Officer Fusco did not.

Second, Officer Duffy and Officer Mitchell were only aware of the injury to Nykiel's wrists and hands. While the officers were en route, Officer Duffy requested an EMS unit come to the Sharpsburg Police Station to evaluate Nykiel's physical injuries. Requesting medical assistance from an emergency medical

21

team is not the act of someone intentionally trying to punish a detainee by denying him medical care.

Third, Nykiel's behavior prior to being in the holding room was normal and did not indicate that he was suffering from a cocaine overdose. Nykiel exited the patrol vehicle and walked into the police station without any assistance. With the exception of mumbling, Nykiel was responsive and cooperative when the Officers escorted him to the station's holding room. Nykiel complied with the Officers' instructions without any difficulty or assistance.

Finally, once inside the station, Officer Duffy left the holding area briefly, leaving Officer Fusco and Officer Mitchell with Nykiel. Soon thereafter, both officers noticed a white paste round Nykiel's mouth. Nykiel then spit a small piece of paper out of his mouth, said that he was having trouble breathing, and began to shake in what seemed, to Officer Fusco, to be a seizure or perhaps a reaction to ingesting cocaine. It was at that point the first EMS team arrived and the officers became aware that Nykiel was experiencing a medical emergency. Officer Fusco requested additional paramedics and told the other officers, including Chief Rudzki, that he believed Nykiel was experiencing a cocaine overdose.

Moreover, both the EMS team and police officers testified that Nykiel fluctuated from involuntary to seemingly voluntary behavior. During one of the voluntary moments, Nykiel became combative and bit a medic who was attempting to help him. Subsequently, the officers testified that they attempted to restrain Nykiel in order to protect him, the other officers, and EMS personnel present. The record indicates that any delay in medical treatment caused by the restraint was in response to Nykiel's combative behavior and was not an intentional delay. Thus, while the medical treatment provided was inadequate to save Nykiel's life, there must be more than inadequate medical attention, incomplete medical treatment, or negligence. See Jackson v. City of Pittsburgh, 688 F.Supp.2d 379, 394 (W.D. Pa. 2010). The officers neither had actual knowledge of a serious risk of harm to Nykiel nor did they ignore evidence of such harm. Accordingly, summary judgment for failure to obtain medical care will be granted.

### iii. Failure to train

Plaintiff contends that the Borough of Sharpsburg and the Borough of Etna violated Nykiel's Fourteenth Amendment rights by showing "deliberate indifference" to persons suffering a cocaine overdose, cocaine-induced excited delirium, and seizures by failing

to adequately train their officers. Plaintiff further contends that had Officers Duffy and Mitchell been adequately trained to deal with an arrestee who was overdosing on cocaine, they would not have tasered him or allegedly broken his neck.

Defendants contend plaintiff has failed to produce any evidence of a policy from the Borough of Sharpsburg or the Borough of Etna that was deliberately indifferent, designed to cause, and actually caused a deprivation of any of Nykiel's constitutional rights. Defendants also assert that none of plaintiff's experts, including her police procedures expert, Van Blaricom, claims the existence of such a policy in his report.

When an action against a municipality is based on Section 1983, the municipality can only be liable when the alleged constitutional violation consists of the implementation or execution of a policy, regulation, or decision that has been officially adopted by the municipality or informally adopted by custom. Monell v. New York City Dept. of Social Services, 436 U.S. 658, 659 (1978). Thus, although there can be no liability for the municipality based on vicarious liability, it can be held responsible in and of itself when injury is caused by its adopted policy or custom. See Beck v. City of Pittsburgh, 89 F.3d 966, 971

(3d Cir. 1996) (citing Monell, 436 U.S. at 694-96).

          To establish a Section 1983 claim for a municipality's
failure to train and supervise employees, a plaintiff must (1)
identify, with particularity that what the supervisory officials
failed to do demonstrates "deliberate indifference," and (2) [show]
a close causal link between the alleged failure and the alleged
injury. Daniels v. Delaware, 120 F. Supp. 2d 411, 423 (D. Del.
2000)(citations omitted); see Reitz v. County of Bucks, 125 F.3d
139, 145 (3d Cir. 1997).

          A plaintiff alleging failure to train is also required to
allege facts "demonstrat[ing] a 'plausible nexus' or 'affirmative
link' between the municipality's failure to train and the specific
deprivation of constitutional rights at issue." Kneipp v. Tedder,
95 F.3d 1199, 1213 (3d Cir. 1996) (citation omitted). A showing of
simple or even heightened negligence is not enough. Berg v. County
of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000)(citations omitted).
Similarly, it is not enough to show that municipal officers could
have been better trained or that additional training could have
reduced the overall risk of constitutional injury. See Canty v.
City of Phila., 99 F. Supp. 2d 576, 581 (E.D. Pa. 2000) (citing
Colburn v. Upper Darby Twp., 946 F.2d 1017, 1029-30 (3d Cir.

1991)).

While using this standard can make it difficult to differentiate between respondeat superior liability and municipal liability, the plaintiff must establish that the municipality's failure to educate its police officers regarding the law was an established practice so permanent and well settled as to constitute a custom or usage with the force of law. Brown v. Smythe, 780 F. Supp. 274, 282 (E.D. Pa. 1991) (citations omitted).

Here, plaintiff has failed to produce sufficient evidence that the municipalities' alleged failure to train was causally connected to Nykiel's death. The record indicates that Officers Duffy and Mitchell underwent training on the recognition of apparent medical conditions and those relating to drugs in general. In addition, Officer Mitchell, the officer who tased Nykiel, successfully completed training with a certified Taser instructor. Though it can always be said that municipal officers could have been better trained or additional training could have reduced the overall risk of constitutional injury, a lack of training is not an issue in the present case.

Moreover, the officers' actions were not the result of a permanent practice, custom, or policy. The officers reacted to

Nykiel's medical emergency as it arose. The record indicates that Nykiel did not exhibit signs of a medical emergency until after he arrived at the Sharpsburg Police Station. Upon his arrival, Nykiel seemed fine initially, and then began to fluctuate between voluntary and involuntary behavior. When the officers believed Nykiel was acting involuntarily, they attempted to give him as much freedom of movement as possible. Additionally, the officers testified that, when Nykiel's behavior appeared to be intentional and harmful to others, such as when he was biting and kicking the medics, they attempted to restrain him so that the medics could treat him. At the request of the officers, the EMTs left the room until it was safe and returned to treat Nykiel to the extent they, along with other officers present, were able to keep him under control.

Based upon these facts, the need for additional training was not obvious and not apparent, and any lack of training in this case did not amount to deliberate indifference by the municipality or supervisory officers. Summary judgment on the failure to train claim will be granted.

### iv. State created danger

Plaintiff contends that defendants violated Nykiel's

27

substantive due process rights under the Fourteenth Amendment through the "state created danger" theory. See Kneipp v. Tedder, 95 F.3d 1199, 1201 (3d Cir. 1996). Plaintiff contends that defendants exposed Nykiel to a danger that he otherwise would not have encountered if not for the actions of the defendants.

Without looking at the merits of the claim, this claim was not alleged in plaintiff's complaint, and thus cannot be brought up at the summary judgment stage.[5] "Efficiency and judicial economy require that the liberal pleading standards under . . . Rule 8(a) are inapplicable after discovery has commenced." See Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004). At the summary judgment stage, the proper procedure for plaintiff to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment. Id.; see, e.g., Fisher v. Metro. Life Ins. Co., 895 F.2d 1073, 1078 (5th Cir. 1990); Green Country Food Mkt., Inc. v. Bottling Group, LLC, 371 F.3d 1275, 1279 (10th Cir. 2004). Accordingly, summary judgment on

_____

[5] Even if the court was to consider the "state created danger" claim on the merits, plaintiff fails to state a claim by failing to point to specific evidence on the record in her response. See Sanford v. Stiles, 456 F.3d 298, 304-305 (3d Cir. 2006); Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006).

the "state created danger" claim will be granted.

    b.    Qualified Immunity

        The    doctrine    of    qualified    immunity    protects
government officials from liability for civil damages insofar as
their conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have
known.    Pearson v. Callahan, 129 S.Ct. 808, 815 (2009).

        In Saucier v. Katz, 533 U.S. 194 (2001), the United
States Supreme Court provided the then controlling two-step inquiry
for analyzing claims of qualified immunity.    The court held that a
court must first determine whether the facts alleged show that
defendants' conduct violated a constitutional or statutory right.
Id. at 201.    If so, the court then must determine whether the
constitutional or statutory right allegedly violated by defendant
was "clearly established."    Id.    If the court concludes that
defendants'    conduct    did    violate    a    "clearly    established"
constitutional or statutory right, then it must deny defendant the
protection afforded by qualified immunity. Id. See, e.g., Brown v.
Muhlenberg Township, 269 F.3d 205, 211 (3d Cir. 2001); Abdul-Akbar
v. Watson, 4 F.3d 195, 204-05 (3d Cir. 1993).

        However, the Supreme Court in Pearson expanded the

_Saucier_ test, holding that courts should be permitted to exercise flexibility and sound discretion in deciding which of the two prongs of qualified immunity should be addressed first "in light of the circumstances in the particular case at hand." 129 S.Ct. at 818.

In addition, in _Anderson v. Creighton_, 483 U.S. 635 (1987), the Supreme Court made clear that "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." _Id_. at 639 (citations omitted).

The right in question, however, cannot simply be a generalized right, like the "right to due process of law." _Anderson_, 483 U.S. at 639. It must be clearly established in a "particularized" sense, so that the "contours of the right" are clear enough for any reasonable official in defendants' position to know that the official's conduct violates that right. _Id_. at 640. This "particularity" requirement does not mean that the very action in question has been held unlawful; it does mean, though, that in the light of the preexisting law, the illegality of the action must be

apparent. Id. The relevant, fact-specific question in qualified immunity cases is whether a reasonable official could have, in light of the preexisting law, believed that his action was lawful. Id. at 641.

We find that based upon the facts presented here and the analysis set forth above, that a jury could find that Nykiel's constitutional rights were violated because the record revealed that Nykiel sustained between 5 to 7 taser drives more than admitted by defendants. Moreover, the autopsy and plaintiff's experts indicate that officers applied unreasonable and excessive force because there is physical evidence of further trauma to his neck, trunk and extremities which remains unexplained. Assuming that that Nykiel's constitutional rights were violated, a jury could also find that the officers could not reasonably have believed that their conduct was lawful. Therefore, summary judgment based upon a defense of qualified immunity will be denied.

B. Plaintiff's state law claims

Defendants contend that plaintiff's state law claims against all five remaining defendants (Borough of Sharpsburg, Borough of Etna, Chief Rudzki, Officer Duffy, and Officer Mitchell,) for battery (Count III), wrongful death (Count IV), and

31

indemnification (Count VI) do not fall within the exceptions to the Pennsylvania Political Subdivision Tort Claims Act's blanket immunity against damages recoverable under common law or a statute. 42 Pa. Cons. Stat. § 8541, et seq. Plaintiff did not respond to the arguments in their response brief.

Plaintiff failed to address defendants' arguments against her state law claims in her response. Failing to respond constitutes an abandonment of those claims. Venter v. Potter, 694 F.Supp.2d 412, 424 n. 8 (W.D. Pa 2010); Seals v. City of Lancaster, 53 F.Supp.2d 427, 432 -433 (E.D.Pa. 2008); Banks v. Gallagher, No. 08-1110, 2010 WL 1903597, *5 n. 6 (M.D.Pa. March 18, 2010). Accordingly, the court need not address the merits of defendants' arguments and the motion for summary judgment will be granted as unopposed with regard to plaintiff's state law claims.

### C.    Supervisor Liability

Defendants contend that plaintiff's supervisor liability claim is erroneous for two reasons: (1) officers did not violate Nykiel's constitutional rights; and (2) the "knowledge and acquiescence" standard invoked by plaintiff against Chief Rudzki was squarely rejected by the United States Supreme Court in Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009).

32

Plaintiff contends that Chief Rudzki assumed a supervisory position when he arrived on the scene. She also contends that he is responsible for the actions of Officer Duffy, if only by his knowledge of the events and acquiescence to the officer's actions.

In Iqbal, the United States Supreme Court upheld the decision in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), that absent respondeat superior, each federal government official is liable for his or her own misconduct. 129 S.Ct. at 1949. However, purpose rather than knowledge is required to impose Bivens liability on the official charged with violations arising from his or her superintendent responsibilities. However, contrary to defendant's position, these cases apply to federal employees and not section 1983 supervisory liability claims.

Instead, supervisory officials may be held liable in certain circumstances for constitutional violations that are committed by their subordinates. The Court of Appeals for the Third Circuit has held that there are two theories of liability under which a plaintiff can sue a municipal official in an individual capacity action. A.M. v. Luzerne County Juvenile Det.

Ctr., 372 F.3d 572, 586 (3d Cir. 2004). Under the first theory, defendants can be sued as policy-makers "if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'" Id. The second theory provides for individual and personal liability if plaintiffs can show that a supervisor "participated in violating their rights, or that he directed others to violate them, or that he ... had knowledge of and acquiesced in his subordinates' violations." Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995) (citing Andrews v. City of Phila., 895 F.2d 1469, 1478 (3d Cir. 1990)).

Moreover, in Stoneking v. Bradford Area School District, the United States Court of Appeals for the Third Circuit specifically stated that supervisory liability could be found only where the official had both "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents" and where there were "circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." 882 F.2d 720, 732 (3d Cir. 1989) (citing Chinchello v. Fenton, 805 F.2d 126 (3d Cir. 1986)).

34

The present case differs from Iqbal and Bivens. First, the officials in Iqbal and Bivens were federal officials and not state officials, like Chief Rudzki, to which the standards of section 1983 apply. Likewise, in Iqbal, the plaintiff was seeking supervisor liability based solely upon the officer's role and not his actions. 129 S.Ct. at 1949. Here, there is a dispute of material facts regarding Chief Rudzki's actions and how they reflect a knowledge of and acquiescence to the detention and subsequent restraining of Nykiel by Officer Duffy and Officer Mitchell for the following reasons.

First, prior to arriving to the Sharpsburg police station that day, he spoke with Officer Duffy on several occasions over the telephone and was aware of the surrounding circumstances of Nykiel's arrest.

Second, upon Chief Rudzki arriving at the station, the record indicates that Nykiel was exhibiting combative behavior, the officers were restraining him, and the medics were treating him. Chief Rudzki observed the events from the hallway when he arrived at the station for approximately three to five minutes and then went back to his office. Prior to returning to his office, Officer Fusco informed him that he strongly believed Nykiel was overdosing

35

on crack cocaine. The record does not reveal that he adequately inquired as to what was going on or the type of medical treatment or physical treatment being administered to Nykiel. This contemporaneous knowledge of possible offending acts as well as inaction on Chief Rudzki's part could be interpreted by a reasonable juror as circumstances under which Chief Rudzki was aware of and acquiesced to Officer Duffy and Officer Mitchell's actions and communicated a message of approval to the allegedly offending officers. For the foregoing reasons, summary judgment on supervisor liability will be denied.

D.    Punitive Damages

While plaintiff has already conceded their punitive damages claim against the Borough of Sharpsburg and the Borough of Etna, plaintiff contends that a punitive damages award may still be appropriate against the individual defendants in their individual capacity.    Plaintiff contends that a reasonable jury could find that the officers' intent, at the accident scene, was to inflict punishment for the high speed pursuit of Nykiel and to deny Nykiel's medical evaluation and care, when they knew he needed it.

The standards for imposing punitive damages under Section 1983 and under Pennsylvania law are similar, but do not completely

36

overlap. Punitive damages in Section 1983 cases are available where defendants have acted with a "reckless or callous disregard of, or indifference to, the rights or safety of others." Rivera v. James, No. 03-4631, 2004 WL 1784351, at * 1 (E.D. Pa. 2004) (citing Savarese v. Agriss, 883 F.2d 1194, 1204 (3d Cir. 1989)).

Punitive damages are to be "reserved for special circumstances," that is, for "cases in which the defendant's conduct amounts to something more than a bare violation justifying damages or injunctive relief." Brennan v. Norton, 350 F.3d 399, 428-29 (3d Cir. 2003); Savarese, 883 F.2d at 1205.

Under Pennsylvania law, punitive damages can only be awarded for conduct that is outrageous, because of the Defendant's evil motive or his reckless indifference to the rights of others, and punitive damages must be based on conduct that is malicious, wanton, reckless, willful and oppressive. Feld v. Merriam, 485 A.2d 742, 747-48 (Pa. 1984).

"The state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." Id. at 748. "Punitive damages are appropriate to punish and deter only extreme behavior and, even in the rare instances in which they are justified, are subject to strict judicial controls." Martin v.

Johns-Manville Corp., 494 A.2d 1088, 1096 (Pa. 1985). The target of punitive damages is "extreme" or "especially egregious" injurious conduct. Id. at 1096-1097. Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment, or even gross negligence. Id. at 1097.

The "reckless indifference" mental state, required to justify the imposition of punitive damages, is obtained only where the "actor knows, or has reason to know, of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk." Martin, 494 A.2d at 1097. Punitive damages are not warranted even where the "actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so." Id. Punitive damages cannot be awarded where a plaintiff is precluded from recovering compensatory damages. Houston v. Texaco, Inc., 538 A.2d 502, 505 (Pa. Super. 1988).

While defendants are correct in their reply brief that plaintiff's accusation of the choke-hold is not the subject of the

present motion, police conduct and other facts on the record can be considered on summary judgment when deciding whether to prevent a plaintiff from seeking punitive damages. See e.g., Fed. R. Civ. P. 56. Moreover, even removing the revenge theory asserted above by plaintiff as a reasonable basis, there are sufficient facts on the record that would allow a reasonable juror to determine that defendants acted in a callous and reckless manner and that defendants' realized or appreciated the high degree of risk involved in using excessive force against Nykiel.

First, Officer Fusco left the room to inform Chief Rudzki that he felt that Nykiel was overdosing on crack cocaine. Officer Fusco was aware that a taser, combined with Nykiel's conduct leading up to the use of the taser, could cause someone to expire. Officer Mitchell had reason to know that the use of a Taser on a subject overdosing on drugs can increase the effects of the overdose. Thus, based upon his taser training, a reasonable jury could construe that using a taser on a prisoner exhibiting such behavior was reckless.

Second, Dr. Omalu authored a death certificate that listed the cause of death as "acute cocaine overdose." He also indicated that "Compression and Fracture of Neck" as a significant

39

contributing factor to death. [Doc. No. 164, Exhibit BB]. Plaintiff's police practices expert, D.P. Van Blaricom, revealed that Nykiel sustained between 5 to 7 taser drives more than admitted by defendants. [Doc. No. 161, Exhibit K, p. 5]. He made numerous findings and determinations in his report including a finding of accidental death. Van Blaricom also opined, inter alia, that officers applied unreasonable and excessive force to a subject in a medical emergency. [Id.].

Based upon these facts and others in the record, we find that there is sufficient evidence to allow a reasonable juror to conclude that defendants acted with reckless or callous disregard of, or indifference to, the rights and safety of Nykiel. Thus, summary judgment will be denied for the punitive damages claims against Officers Duffy and Mitchell and Chief Rudzki.

IV. Conclusion

Accordingly, defendants' joint motion for partial summary judgment will be granted in part and denied in part.

An appropriate order follows.

40

```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHERYL NYKIEL, individually and )
and as ADMINISTRATRIX of the    )
ESTATE OF GREGORY T. NYKIEL,    )
Deceased,                       )
                                )
          Plaintiff,            )
                                )
     v.                         ) Civil Action No. 08-0813
                                )
BOROUGH OF SHARPSBURG,          )
SHARPSBURG POLICE DEPARTMENT,   )
LEO RUDZKI, THOMAS DUFFY,       )
BOROUGH OF ETNA,                )
ETNA POLICE DEPARTMENT,         )
And CHAD MITCHELL,              )
                                )
          Defendants.           )
```

ORDER

AND NOW, this 8th day of March, 2011, upon consideration of defendants' joint motion for partial summary judgment [Doc. No. 155, 170], and plaintiff's response thereto [Doc. No. 167], for the reasons stated in the accompanying memorandum, IT IS HEREBY ORDERED THAT:

1) Borough of Sharpsburg Police Department and Borough of Etna Police Department are not legal entities separate from the Boroughs and are not subject to suit. Accordingly, these police departments are dismissed with prejudice from this action.

2) Count I against Officer Duffy, Officer Mitchell, and Chief Rudzki under § 1983;

     a.  Summary judgment of all claims against Officer

Duffy, Officer Mitchell, and Chief Rudzki in their official capacities are granted with prejudice as a matter of law;

b. Summary judgment of § 1983 claims for excessive force against Officer Duffy, Officer Mitchell, and Chief Rudzki in their individual capacities are denied;

c. Summary judgment of § 1983 claims for failure to obtain medical care against Officer Duffy, Officer Mitchell, and Chief Rudzki in their individual capacities are granted without prejudice; and

d. Summary judgment of § 1983 claim for state created danger against all defendants is granted without prejudice.

3) Count II against Borough of Sharpsburg and Borough of Etna under § 1983;

a. Summary judgment for all § 1983 claims against the Borough of Sharpsburg and Borough of Etna are granted without prejudice.

4) Count III against all Defendants for battery;

a. Summary judgment for the claim of battery against Borough of Sharpsburg and Borough of Etna is granted with prejudice as a matter of law; and

b. Summary judgment for the claim of battery against Officer Duffy, Officer Mitchell, and Chief Rudzki is granted without prejudice.

5) Count IV against all Defendants for wrongful death;

a. Summary judgment for the claim of wrongful death against Borough of Sharpsburg and Borough of Etna is granted with prejudice as a matter of law; and

b. Summary judgment for the claim of wrongful death against Officer Duffy, Officer Mitchell, and Chief Rudzki is granted without prejudice.

6) Count V against all Defendants for survival;

a. Summary judgment for the claim of survival against Borough of Sharpsburg and Borough of Etna is granted with prejudice as a matter of law; and

b. Summary judgment for the claim of survival against Officer Duffy, Officer Mitchell, and Chief Rudzki is granted without prejudice.

7) Count VI against all entities for indemnification pursuant

to 42 Pa. Cons. Stat. § 8548;

    a. Summary judgment for the claim of indemnification against Borough of Sharpsburg and Borough of Etna is granted with prejudice as a matter of law.

    b. Summary judgment for the claim of indemnification against Officer Duffy, Officer Mitchell, and Chief Rudzki is granted without prejudice.

7) Plaintiff's claim for punitive damages

    a. Summary judgment for plaintiff's request for punitive damages against Borough of Sharpsburg and Borough of Etna is granted with prejudice as a matter of law; and

    b. Summary judgment for plaintiff's request for punitive damages against Officer Duffy, Officer Mitchell, and Chief Rudzki is denied.

BY THE COURT:

_____, C.J.

cc: All counsel of record